IN the MATTER OF the RETURN OF PROPERTY IN STATE V. Donald L. PIPPIN, Jr.:

NATIONAL PAWN BROKERS UNLIMITED, and Hull Loan Systems, Appellants,

v.

OSTERMAN, INC., Respondent.

Court of Appeals

*No. 91-2666. Submitted on briefs May 8, 1992.—Decided April 22, 1993.*

(Also reported in 500 N.W.2d 407.)

419

420

For the appellants the cause was submitted on the brief of *Antonette Hue Laitsch* of *Murphy & Desmond,*

*S.C.* of Madison, and co-counsel *Stuart E. Gale* of Bloomington, Minnesota.

For the respondent the cause was submitted on the brief of *Patricia K. McDowell, Donald K. Schott* and *Anthony A. Tomaselli* of *Quarles & Brady* of Madison.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

GARTZKE, P.J. National Pawn Brokers and Hull Loan Systems ("pawnbrokers") appeal from a circuit court order returning jewelry to Osterman, Inc. The jewelry was evidence in a trial on criminal charges against Donald Pippin. He had obtained it from Osterman, a retail jeweler in Madison, Wisconsin, by paying with a bad check and then pawned it to appellants in Minnesota.[1] Both sides claim a security interest in the jewelry. We hold that the pawnbrokers' security interests are prior to Osterman's. We reverse.

The issues are: (1) whether the Wisconsin circuit court had jurisdiction to determine who is entitled to possession of the jewelry; (2) whether Pippin had rights in the jewelry to which the pawnbrokers' security interests could attach, even though Osterman had reserved title to the jewelry and had prohibited its transfer until the purchase price was fully paid; (3) if the pawnbrokers acquired security interests in the jewelry and perfected their interests by possession, whether that perfection continued after the police seized the jewelry pursuant to a search warrant; and (4) if the pawnbrokers' security interests did not attach or were no longer

---

[1] Hull asserts that it is a regulated thrift company and not a pawnbroker. The circuit court concluded Hull fits the definition of "pawnbroker" in MINN. STAT. § 471.925(1). Because that conclusion is unchallenged on appeal, we, too, refer to Hull as a pawnbroker.

perfected when Osterman perfected its interest, whether Osterman is estopped from asserting that its interest is superior to the claims of the pawnbrokers.

We conclude that the circuit court had jurisdiction, Pippin had rights in the jewelry to which the pawnbrokers' security interests could attach, their interests were perfected by possession and perfection continued after seizure. Because their security interests were perfected before Osterman's, the pawnbrokers' security interests have priority over Osterman's. The jewelry should be returned to the pawnbrokers. We do not reach the question of whether Osterman is estopped from asserting the priority of its security interest.

## I. FACTS

The pertinent facts are undisputed. On November 24, 1990, Pippin purchased the jewelry from Osterman in Madison. The purchase price was $39,750.38. Pippin signed three documents in connection with the sale. The first was a credit application. It provides personal information regarding Pippin, including his Menomonie, Wisconsin address and describes the jewelry. The second was a sales agreement. It describes the items sold, the purchase price, the amount paid by check and the balance payable under a "Super Charge" agreement. It provides,

> The balance due on this purchase is payable in installments under my credit plan contract and security agreement which is incorporated herein by reference. I agree that seller shall retain ownership of the items so purchased until entire balance is fully paid . . . .

The third was a "Super Charge Retail Charge Agreement," by which Pippin agreed that in consideration of the sale,

> A security interest in each item of goods purchased hereunder and the proceeds thereof shall remain with Seller until the unpaid balance directly relating to each such item of goods purchased is fully paid. Buyer will not dispose of the goods . . . or encumber them without written consent of Seller . . . until Buyer has fully paid for them.

Pippin paid Osterman $30,000 by check, and agreed to pay the balance in installments. The check was drawn on a closed account. On November 27, 1990, he pawned some of the jewelry to National in Bloomington, Minnesota, for a $6,995 loan and on November 30, 1990, he pawned the remaining items to Hull in Minneapolis for a $2,076.04 loan. He signed a promissory note and security agreement with Hull. No written security agreement with National is of record.

On December 6, 1990, a criminal complaint issued in Dane County, Wisconsin, charging Pippin with violating sec. 943.24(2), Stats. (1989-90), issuing a check payable for more than $500, intending it not be paid.[2] Having learned that Pippin had pawned the jewelry, the Madison police requested the Minnesota police to obtain a search warrant directed to the pawnbrokers' businesses. The Minnesota police did so, and on December 11, 1990, they seized the jewelry from the pawnbrokers and turned it over to the Madison police the next day. On December 13, 1990, the Madison police delivered the jewelry to Osterman but retook it

---

[2] In February 1991, Pippin was also charged with violating sec. 943.20(1)(d), Stats., obtaining property by a false representation with intent to defraud.

the next day for use as evidence at the criminal trial. Pippin was convicted.

On December 26, 1990, the pawnbrokers petitioned the Dane County Circuit Court for Dane County, Wisconsin, for return of the jewelry. On February 12, 1991, Osterman also petitioned for its return and, on February 14, filed a financing statement in the office of the Wisconsin Secretary of State and in the offices of the Dane and Dunn County Registers of Deeds.[3] On July 25, 1991, the pawnbrokers petitioned the Minnesota court which issued the search warrant for return of the jewelry to that court. On August 13, 1991, the Dane County Circuit Court entered the order before us on appeal, and on October 22, 1991, the Minnesota court denied the pawnbrokers' petition to it because they had chosen to litigate the matter in Wisconsin.

## II. JURISDICTION

Although the pawnbrokers petitioned the Dane County Circuit Court for return of the jewelry under sec. 968.20, Stats., they argue first that the Minnesota court which issued the warrant should decide the matter and second that the Dane County Circuit Court lacked subject-matter jurisdiction under that statute.[4]

---

[3] Pippin resided in Dunn County.

[4] Section 968.20(1), Stats., provides in relevant part:

Any person claiming the right to possession of property seized pursuant to a search warrant or seized without a search warrant may apply for its return to the circuit court for the county in which the property was seized or where the search warrant was returned. The court shall order such notice as it deems adequate to be given the district attorney and all persons who have or may have an interest in the property and shall hold a hearing to hear all claims to its true ownership. If the right to possession is proved to the court's satisfaction, it shall order the property . . . returned if:

(a) The property is not needed as evidence . . . or

They contend that only the court for the county where the property was seized or to which the warrant was returned has jurisdiction to hear a sec. 968.20 motion. Since the Dane County Circuit Court fits neither category, the pawnbrokers conclude the court lacked subject-matter jurisdiction to hear their petition. We reject their contentions.

Because the Minnesota court declined to decide the matter on grounds that the pawnbrokers chose Wisconsin as their forum, and we conclude that the Dane County Circuit Court had both subject-matter and personal jurisdiction, we decline to pursue the pawnbrokers' claim that this case belongs in Minnesota.

We agree that sec. 968.20(1), Stats., has no application to the pawnbrokers' petition in the Dane County Circuit Court. The statute applies when a petition is made to the circuit court for the county in which the property was seized or to the circuit court to which return was made of the warrant authorizing seizure. Neither of those factual circumstances occurred. But that does not deprive the circuit court of subject-matter jurisdiction.

In this state, subject-matter jurisdiction is vested in the circuit court by the constitution of this state, and "[n]o circuit court is without subject matter jurisdiction to entertain actions of any nature whatsoever." *Mueller v. Brunn*, 105 Wis. 2d 171, 176, 313 N.W.2d 790, 792 (1982). However, if a statute prevents the court from

_____

(b)  All proceedings in which it might be required have been completed.

exercising that jurisdiction, it lacks competency to proceed. *Id.* at 176-78, 313 N.W.2d at 792-93.

Although sec. 968.20(1), Stats., has no application to the pawnbrokers' petition, the circuit court was competent to proceed. Nothing in sec. 968.20(1) reflects an intention that the circuit court is competent to order return of seized property only if the circumstances described in the statute have occurred. When, as here, no statute applies, and no statute prevents a circuit court having personal jurisdiction over the parties from adjudicating the matter before it, the court may proceed under its constitutional authority. No question having been raised regarding personal jurisdiction, we conclude that the Dane County Circuit Court was competent to determine the interests of the parties in the jewelry.

III. PAWNBROKERS' SECURITY INTERESTS
ATTACHED
TO THE JEWELRY

A security interest "is not enforceable against the debtor or third parties with respect to the collateral and does not attach" unless the debtor signed a security agreement containing a description of the collateral or the collateral is in the possession of the secured party pursuant to agreement, value was given, and "the debtor has rights in the collateral."[5] U.C.C. § 9-

---

[5] Attachment . . . refers to the notion that the creditor's interest in personal property clamps down on specified personal property as soon as the requisites set forth in section 9-203 are complied with. The concept of attachment may thus be thought of as a giant hand of a secured creditor hovering in the universe; as soon as the requirements set forth in section 9-203 are met, the giant hand,

203(1), sec. 409.203(1), Wis. Stats., and MINN. STAT. § 336.9-203(1).[6]

Osterman asserts that the third requirement — the debtor has rights in the collateral — has not been met for the pawnbrokers' security interests to attach to the collateral. Osterman relies on the sales agreement which provides that Osterman retains ownership of the jewelry until the purchase price is fully paid, and on its security agreement which prohibits Pippin from disposing of the jewelry without Osterman's consent.

Article 9 of the Uniform Commercial Code does not define "rights in the collateral." Because Osterman's transaction with Pippin was a sale, Article 2 determines whether he had such rights. 8 R. ANDERSON, UNIFORM COMMERCIAL CODE, sec. 9-203:44, at 688 (1985) (footnote omitted).

Osterman's sales agreement and security agreement do not affect Pippin's rights in the collateral. The debtor's "rights" in the collateral do not depend on whether the debtor has title to it. "Each provision of this Article with regard to . . . rights . . . applies irrespective of title to the goods . . . ." U.C.C. § 2-401, sec. 402.401, Wis. Stats., and MINN. STAT. § 336.2-401; *see also* U.C.C. § 9-202, sec. 409.202, Wis. Stats., and MINN. STAT. § 336.9-202.

Article 2 converts Osterman's retention of title into a security interest. "Any retention or reservation by the

the security interest, clamps down upon the property agreed to between the parties, and thereafter, at least to some extent, the property is subject to the security interest.

8 W. HAWKLAND, UNIFORM COMMERCIAL CODE SERIES, sec. 9-203:03, at 638 (1990).

[6] Because Wisconsin and Minnesota have enacted the Uniform Commercial Code, with changes not relevant here, we cite to both sets of statutes as well as the Code itself.

seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." U.C.C. § 2-401(1), sec. 402.401(1), Wis. Stats., and MINN. STAT. § 336.2-401(1). The attempted prohibition of sale in Osterman's security agreement is part of its security interest.[7]

■

We look to the laws of Wisconsin to determine whether Pippin had rights in the collateral. Whatever rights he acquired in the jewelry resulted from his purchase in Wisconsin. Under these circumstances, chs. 401 through 411, Wis. Stats., apply to that transaction, since it bears an appropriate relation to this state, and no other provision in those chapters specifies that the law of another state applies. U.C.C. § 1-105(1), sec. 401.105(1), Wis. Stats., and MINN. STAT. § 336.1-105(1).

■

Pippin had voidable title to the collateral because he procured it by a dishonored check. That was the rule at common law and is the rule under Article 2. 2 HAWKLAND, sec. 2-403:03, at 869-70; *Hudiburg Chevrolet, Inc. v. Ponce*, 17 Wis. 2d 281, 285-86, 116 N.W.2d 252, 255 (1962). "A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though . . . (b) the delivery was in exchange for a check which is later dishonored . . . ." U.C.C. § 2-403(1), sec. 402.403(1), Wis. Stats., and MINN. STAT. § 336.2-403(1).

---

[7] A debtor may transfer its rights in collateral notwithstanding a provision in the security agreement prohibiting the transfer. U.C.C. § 9-311, sec. 409.311, Wis. Stats., and MINN. STAT. § 336.9-311.

Pippin therefore possessed the power to transfer title to a good faith purchaser for value.

■

Possessing the power under U.C.C. § 2-403(1) to transfer good title to a good faith purchaser for value, Pippin had the power and the right to transfer a security interest to a creditor, including an Article 9 secured party. *In re Samuels & Co.*, 526 F.2d 1238, 1243 (5th Cir. 1976) (en banc) (per curiam). Consequently, Pippin's rights in the collateral were sufficient to allow attachment of a security interest. *Id.*[8]

Osterman nevertheless contends that the debtor who does not "own" the collateral may create a security interest in it only if authorized by the true owner. No reported Wisconsin case supports that contention, and it is wrong in light of U.C.C. § 2-401, sec. 402.401, Wis. Stats., and MINN. STAT. § 336.2-401. In *State Bank of Young America v. Vidmar Iron Works, Inc.*, 292 N.W.2d 244 (Minn. 1980), a metal fabricator received the overflow work of a metal shop and did not own the material it received. The Minnesota Supreme Court held that the fabricator had sufficient rights in the collateral to allow a security interest to attach. *Id.* at 250.

Osterman cites the Wisconsin rule that a bailee who acquires the property of another for a limited purpose does not have "rights in the collateral" to which a security interest can attach. *Chrysler Corp. v. Ada-*

---

[8] *Zions First Nat'l Bank v. First Sec. Bank*, 534 P.2d 900 (Utah 1975), reached a different conclusion. The *Zions* court held that when the debtor's security agreement with its seller provided that title could not pass until the purchase price was paid, the debtor's creditor could not obtain a security interest in the collateral. *Id.* at 902. Because the *Zions* court did not address U.C.C. §§ 2-403(1) or 9-203(1)(c), we are unpersuaded that it reached the correct result.

*matic, Inc.*, 59 Wis. 2d 219, 235, 208 N.W.2d 97, 104 (1973), *overruled on other grounds, Daniel v. Bank of Hayward*, 144 Wis. 2d 931, 425 N.W.2d 416 (1988). The rule does not apply. In *Chrysler Corp.*, a bailee acquired possession of the owner's machinery merely to modify it. Pippin purchased the jewelry, was not a bailee and did not obtain possession for a limited purpose.

Osterman erroneously relies on *In re Chicago, Madison & N. Ry. Co.*, 36 Bankr. Rep. 292 (W.D. Wis. 1984), for the proposition that the debtor who does not "own" the collateral may create a security interest in it only if authorized by the owner. The question before the bankruptcy court was whether a bank acquired a security interest in railroad ties a railroad company possessed under its agreement with the owner of the ties to maintain the railroad track. Citing *Chrysler Corp.*, the court held that since the railroad "had no ownership rights in the collateral, but was in possession of the ties only for the limited purpose of using the ties in maintenance and rehabilitation of the track, the Bank's security interest never attached to these ties." *In re Chicago*, 36 Bankr. Rep. at 298. The case before us is far different. Pippin was a buyer. He did not obtain possession of the collateral for a limited purpose, such as its repair.

Osterman cites another Wisconsin case, *Production Credit Ass'n v. Nowatzski*, 90 Wis. 2d 344, 280 N.W.2d 118 (1979). In that case PCA perfected a security interest in the debtor's collateral. After defaulting on its obligations to PCA, the debtor turned the collateral over to Nowatzski, and PCA demanded its return. When Nowatzski refused, PCA sued him in conversion. The statement in the opinion that only the debtor's rights in the collateral inured to the benefit of the

431

transferee must be read in context. *Id.* at 350, 280 N.W.2d at 121. Because Nowatzski acquired the collateral after PCA had perfected its security interest, he took subject to PCA's right of possession. The supreme court so held. *Id.* at 351, 280 N.W.2d at 121. When a security agreement attaches to collateral under ch. 409, Wis. Stats., was not an issue. The opinion does not refer to attachment.

Osterman also cites *Chartered Bank of London v. Chrysler Corp.*, 115 Cal. App. 3d 755, 171 Cal. Rptr. 748 (1981), and *Disch v. Raven Transfer and Storage Co.*, 17 Wash. App. 73, 561 P.2d 1097 (1977). Neither is in point. In *Chartered Bank*, a security interest was claimed in a boat. The purchaser never acquired any rights in the boat which was kept on the seller's premises under a field-warehousing plan and had never been released by the boat manufacturer. In *Disch*, the tenant of a furnished house attempted to give a security interest in the furniture after he vacated the premises. In both those cases, the debtor had no rights whatever in the collateral. In the case before us, Pippin acquired a right under U.C.C. § 2-403(1) — the right to transfer good title to a good faith purchaser for value. A security interest could attach because of that right. *Samuels*, 526 F.2d at 1243.

## IV.   PAWNBROKERS' SECURITY INTERESTS REMAIN PERFECTED

The pawnbrokers acquired their security interests and perfected them by possession in Minnesota. The law of that state determines whether those interests remained perfected on February 14, 1991, when Osterman perfected its security interest by filing a financing statement. U.C.C. § 9-103(1)(b), sec. 409.103(1)(b),

Wis. Stats., and MINN. STAT. § 336.9-103(1)(b).[9] If the pawnbrokers' security interests remained perfected, those interests have priority over Osterman's under the law of both Minnesota and Wisconsin, as well as the Code itself:

> [P]riority between conflicting security interests in the same collateral shall be determined according to the following rules:
>
> (a)  Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.
>
> (b)  So long as conflicting security interests are unperfected, the first to attach has priority.

U.C.C. § 9-312(5), sec. 409.312(5), Wis. Stats., and MINN. STAT. § 336.9-312(5).

"A security interest in . . . goods . . . may be perfected by the secured party's taking possession of the collateral. . . . A security interest is perfected by possession from the time possession is taken without a relation back and continues only so long as possession

---

[9] U.C.C. § 9-103(1)(b) provides in relevant part:

[P]erfection and the effect of perfection or non-perfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected.

The collateral was in Minnesota when the last events occurred "on which is based the assertion" that the pawnbrokers' security interests were perfected or unperfected, i.e., taking possession and losing possession.

is retained, unless otherwise specified in this Article. . . ." U.C.C. § 9-305, sec. 409.305, Wis. Stats., and MINN. STAT. § 336.9-305. The parties cite no Minnesota case that discusses whether a security interest perfected by possession remains perfected when police seize the collateral pursuant to a search warrant.

Although it authorizes perfection by the secured party's taking possession of the collateral, the Code does not define "possession." Without a definition, "possession" is protean and ambiguous.

> Throughout the law "possession" is a notoriously slippery concept; age-old property law recognizes and distinguishes among constructive possession, physical possession, actual possession, mere custody, and a host of other similar notions. . . . In the course of the hundreds of decisions which have dealt with its meaning, the word "possession" has taken on a wonderfully plastic form and has accommodated itself to the needs of the real property law, the law of consignment, insurance, and the criminal law. The drafters of the UCC were aware of this history, and they wisely declined the futile task of defining possession in the Code. . . . We are left, therefore, with several hundred years of cases and with the policy of Article Nine to help us define the word possession.

2 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE, sec. 24-12, at 350-51 (3rd ed. 1988).

We therefore analyze "possession" in U.C.C. § 9-305, sec. 409.305, Wis. Stats., and MINN. STAT. § 336.9-305, in light of the reason why a security interest may be perfected by possession of the collateral.

In his discussion of perfection by possession, Professor Gilmore states:

434

The requirement that a secured party take possession of his collateral — or at least effectively remove it from his debtor's possession and control — in order to perfect his interest dates from the beginning of legal history. . . . The basic idea is that the secured creditor must do something to give effective public notice of his interest; if he leaves the property in the debtor's possession and under his apparent control, the debtor will be given a false credit and will be enabled to sell the property to innocent purchasers or to induce other innocent persons to lend money to him on the strength of his apparently unencumbered assets.

1 G. GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY, sec. 14.1, at 438 (1965) (footnote omitted).

White and Summers comment that "possession (particularly by one known to be in the lending business) is a perfectly sound indication of a security interest." WHITE & SUMMERS, sec. 24-12, at 347-48. They add that

the pledge, like automatic perfection of security interests in consumer goods, facilitates secured financing in small-sum transactions. Pawnbrokers make numerous small loans. Requiring a financing statement for each such transaction might seriously curtail the availability of informal loans or significantly increase the cost of such credit to those least able to bear increased costs.

*Id.* at 348.

The notice function of possession by the secured creditor persuades us that police seizure does not interrupt that possession under U.C.C. § 9-305. Third parties know the police make no claim to own the prop-

erty they seized pursuant to a warrant.[10] For that reason, we are satisfied that seizure from the pawnbrokers did not interrupt their possession for purposes of U.C.C. § 9-305, sec. 409.305, Wis. Stats., and MINN. STAT. § 336.9-305. The discussion by White and Summers of a bankruptcy case, *In re Republic Engine and Mfg. Co.*, 3 U.C.C. Rep. Serv. (Callaghan) 655 (Bankr. N.D. Ohio 1966), convinces us that this should be the law.

In *Republic Engine*, after the sheriff levied on the debtor's equipment, a creditor (who was also the debtor's landlord) locked the doors of the building in which the equipment was located. When the debtor filed bankruptcy, the creditor surrendered possession of the equipment to the sheriff. White and Summers reject the bankruptcy court's holding in *Republic Engine* that the creditor's "surrender of possession to the sheriff subsequent to the lockout dissolved any perfection which he might have had during the time the goods were locked up on the premises. . . . Secured creditors should be encouraged to cooperate with law

---

[10] Third parties are bound to know that property in the possession of the police by virtue of legal process is property in the custody of the law — *custodia legis*, as the older cases put it. Property seized by Minnesota law enforcement authorities pursuant to a warrant is in *custodia legis. Manter v. Petrie*, 143 N.W. 907, 908 (Minn. 1913). Property in *custodia legis* in Minnesota cannot be seized from the officer holding it. *In re Telesports Productions, Inc.*, 476 N.W.2d 798, 800 (Minn. Ct. App. 1991). Nor can property in *custodia legis* "be replevied from the officer in whose charge it is . . . after the levy of the execution." *Kelso v. Younggren*, 90 N.W 316, 317 (Minn. 1902). This is also the law of Wisconsin. *See generally Welch v. Fiber Glass Eng'g, Inc.*, 31 Wis. 2d 143, 146-50, 142 N.W.2d 203, 204-06 (1966); *Plan Credit Corp. v. Swinging Singles, Inc.*, 54 Wis. 2d 146, 152-53, 194 N.W.2d 822, 825-26 (1972).

enforcement officers. Moreover, possession by the sheriff will deter further reliance on the collateral by third parties." WHITE & SUMMERS, sec. 24-12, at 352-53.

Far from cooperating with the Minnesota police, the pawnbrokers refused to surrender the collateral, and that resulted in the warrant and seizure. But depriving the pawnbrokers' security interests of perfection merely because the police seize the collateral under a warrant will hardly encourage future cooperation by creditors with the police.

Because possession is not interrupted when law enforcement officers levy on the collateral, possession should be deemed continuous even if the police seize it. In *Waterhouse v. Carolina Limousine Mfg., Inc.*, 96 N.C. App. 109, 384 S.E.2d 293 (1989), Waterhouse levied execution on its debtor's property in possession of the debtor's creditor, Southwestern, who asserted that it had perfected its security interest in the collateral by possession under U.C.C. § 9-305. The trial court concluded that the levy interrupted Southwestern's possession but nevertheless ruled that its security interest had priority over Waterhouse's interest. The North Carolina Court of Appeals reversed, not on the merits, but because of a standard of appellate review.[11]

---

[11] White and Summers incorrectly cite *Waterhouse v. Carolina Limousine Mfg., Inc.*, 96 N.C. App. 109, 384 S.E.2d 293 (1989), as holding that where a secured creditor perfected by possession by padlocking the plant where the collateral was, the creditor "lost perfected status when the sheriff posted a notice of levy on the padlocked plant on behalf of the judgment creditor." WHITE & SUMMERS, sec. 24-12, 1992 Supp., at 82-83. The *Waterhouse* holding is that because no exception was taken to it, the trial court's conclusion that the creditor lost perfected status was the law of the case.

However, the *Waterhouse* court expressed its view of the merits in *dicta*. The court described the trial court's conclusion regarding interruption of possession as a "misapprehension of applicable law." 384 S.E.2d at 295. The court said, "In one case remarkably similar to the instant case the court found that a creditor who had perfected his security interest in goods by possession had priority over the sheriff who, at a later date, levied on the goods for delinquent personal property taxes of the debtor. *Walter [E.] Heller & Co. v. Salerno*, 168 Conn. 152, 362 A.2d 904 (1975)." *Waterhouse*, 384 S.E.2d at 295. The *Heller* court held that when the plaintiff perfected its security interest in the debtor's collateral, and the defendant later attempted to levy on the collateral, the plaintiff's interest was prior to the defendants. 362 A.2d at 907.[12]

## V. CONCLUSION

■

Because Pippin had a right in the jewelry purchased by a bad check from Osterman's, the pawnbrokers' security interests attached to the jewelry, they perfected their security interests by possession, and that possession was not interrupted, for purposes of U.C.C. § 9-305, sec. 409.305, Wis. Stats., and MINN. STAT. § 336.9-305, when Osterman perfected its security interest. The interests of the

---

[12] If Osterman would have filed its financing statement within twenty days of Pippin obtaining the jewelry, its perfected interest would have been prior to the pawnbrokers'. Section 409.312(4), Wis. Stats. (In Minnesota, a holder of a purchase money security interest in consumer goods need not file to perfect its interest. MINN. STAT. § 336.9-302(1)(d).) Osterman does not argue that it perfected its interest when it re-gained possession from the police on December 13.

pawnbrokers have priority over Osterman's interest. For that reason, the trial court erred when it ordered that possession of the collateral, the jewelry, be granted to Osterman's. On remand, the trial court shall enter judgment giving possession to the pawnbrokers.

*By the Court.*—Judgment reversed and cause remanded for further proceedings consistent with this opinion.